[Cite as *In re E.H.*, 2020-Ohio-2835.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | Hon. Patricia A. Delaney, P.J. |
| E.H., W.H., J.N. | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| | : | |
| | : | |
| | : | Case Nos.  2019 CA 00108 |
| | : | 2019 CA 00109 |
| | : | 2019 CA 00110 |
| | : | |
| | : | O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Court of Common Pleas, Juvenile Division, Case Nos. F2017-0351, F2017-0352, F2017-0353 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT: | May 6, 2020 |

APPEARANCES:

For Appellant-Father

JERMAINE COLQUITT
33 West Main Street
Suite 109
Newark, OH  43055

For Mother

Carolynn E. Fittro
1335 Dublin Road
Suite 115F
Columbus, OH  43215

For Appellee-LCJFS

PAULA M. SAWYERS
20 South Second Street
Fourth Floor
Newark, OH  43055

Guardian ad Litem

SCOTT SIDNER
39 Northview Drive
Johnstown, OH  43031

*Wise, Earle, J.*

{¶ 1}   Appellant-Father, C.H., appeals the October 1, 2019 judgment entries of the Court of Common Pleas of Licking County, Ohio, Juvenile Division, denying motions for legal custody and terminating his parental rights and granting permanent custody of his children to appellee, the Licking County Department of Job and Family Services.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   On May 22, 2017, appellee filed complaints for temporary legal custody of E.H. born in March 2015 (Case No. F2017-0351), W.H. born in March 2017 (Case No. F2017-0352), and J.N. born in November 2012 (Case No. F2017-0353), claiming the children to be dependent children.  Father of E.H. and W.H. is appellant herein; father of J.N. is J.A., presumed deceased; mother of all three children is N.H.  Appellee had been granted emergency shelter care of the children three days earlier.

{¶ 3}   An adjudicatory hearing was held before a magistrate on July 12, 2017.  By decisions filed same date, the magistrate found the children to be dependent and ordered temporary custody of the children to remain with appellee.  The trial court approved and adopted the magistrate's decisions via judgment entries filed July 13, 2017.  Case plans were immediately filed thereafter.

{¶ 4}   On November 8, 2017, mother filed motions to grant temporary custody of the children to either the children's maternal grandparents or their maternal great aunt and uncle.

{¶ 5}   On April 18, 2018, appellee filed motions for permanent custody due to the parents being unable to make any significant progress on the case plans and the children should not or could not be placed with either parent within a reasonable amount of time.

Mother's motions for temporary custody were to be heard at the permanent custody hearing.  Hearings were held before a magistrate on February 15, and 22, 2019.  Prior to the hearings, mother orally moved to amend her motions for temporary custody to motions for legal custody to either of the aforementioned relatives.  By decisions filed July 22, 2019, the magistrate denied the motions for legal custody and granted appellee's motions for permanent custody.

{¶ 6}   Each parent filed objections.  By judgment entries filed October 1, 2019, the trial court denied the objections, approved and adopted the magistrate's decisions, and granted permanent custody of the children to appellee.

{¶ 7}   Appellant-Father filed an appeal in each case and this matter is now before this court for consideration.[1]  The assignments of error in each of the three appeals are identical and are as follows:

I

{¶ 8}   "THE MAGISTRATE ABUSED ITS DISCRETION WHEN IT DENIED MOTHER'S MOTION TO GRANT LEGAL CUSTODY OF ALL THREE MINOR CHILDREN TO EITHER MATERNAL GRANDPARENTS OR IN THE ALTERNATIVE TO MATERNAL GREAT AUNT AND UNCLE [C. AND T. A.] AND ERRED IN GRANTING THE LICKING COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES PERMANENT CUSTODY OF THE MINOR CHILDREN."

II

---

[1]Mother also filed appeals (Case Nos. 2019 CA 00111, 2019 CA 00112, and 2019 CA 00113), and her arguments will be reviewed therein.

{¶ 9}   "THE TRIAL COURT ERRED IN FINDING THAT THE BEST INTERESTS OF THE MINOR CHILDREN WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY."

I

{¶ 10} In his first assignment of error, father claims the trial court abused its discretion in denying mother's motions for legal custody to relatives.  We disagree.

{¶ 11} R.C. 2151.353(A)(3) states the following in pertinent part:

>       (A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:
>
>       (3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings.

{¶ 12} We agree with the following analysis set forth by our colleagues from the Eighth District in *In re D.T.,* 8th Dist. Cuyahoga Nos. 100970 and 100971, 2014-Ohio-4818, ¶ 19-22:

>       Legal custody is significantly different than the termination of parental rights in that, despite losing legal custody of a child, the parent of the child retains residual parental rights, privileges, and responsibilities.  *In*

*re G.M.,* 8th Dist. Cuyahoga No. 95410, 2011-Ohio-4090, ¶ 14, citing R.C. 2151.353(A)(3)(c). In such a case, a parent's right to regain custody is not permanently foreclosed. *In re M.J.M.* [8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674] at ¶ 12. For this reason, the standard the trial court uses in making its determination is the less restrictive "preponderance of the evidence." *Id.* at ¶ 9, citing *In re Nice,* 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist.2001). "Preponderance of the evidence" means evidence that is more probable, more persuasive, or of greater probative value. *In re C.V.M.,* 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7.

Unlike permanent custody cases in which the trial court is guided by the factors outlined in R.C. 2151.414(D) before terminating parental rights and granting permanent custody, R.C. 2151.353(A)(3) does not provide factors the court should consider in determining the child's best interest in a motion for legal custody. *In re G.M.* at ¶ 15. We must presume that, in the absence of best interest factors in a legal custody case, "the legislature did not intend to require the consideration of certain factors as a predicate for granting legal custody." *Id.* at ¶ 16. Such factors, however, are instructive when making a determination as to the child's best interest. *In re E.A.* [8th Dist. Cuyahoga No. 99065, 2013-Ohio-1193] at ¶ 13.

The best interest factors include, for example, the interaction of the child with the child's parents, relatives, and caregivers; the custodial history of the child; the child's need for a legally secure permanent placement; and whether a parent has continuously and repeatedly failed to substantially

remedy the conditions causing the child to be placed outside the child's home.  R.C. 2151.414(D).

Because custody determinations " 'are some of the most difficult and agonizing decisions a trial judge must make,' " a trial judge must have broad discretion in considering all of the evidence.  *In re E.A.* at ¶ 10, quoting *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).  We therefore review a trial court's determination of legal custody for an abuse of discretion.  *Miller v. Miller,* 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).  An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

*Accord, In re L.D.,* 10th Dist. Franklin No. 12AP-985, 2013-Ohio-3214; *Stull v. Richland County Children Services,* 5th Dist. Richland Nos. 11CA47 and 11CA48, 2012-Ohio-738.

{¶ 13} Final hearings were held on February 15, and 22, 2019.  On the morning of the first hearing date, mother orally moved to amend her motions for temporary custody to motions for legal custody to either the children's maternal grandparents (F.M. and E.M.) or their maternal great aunt and uncle (C.A. and T.A.).  T. at 7-8.  The magistrate acknowledged that the grandparents and the great aunt signed a statement of understanding form as required under R.C. 2151.353(A)(3).  T. at 8.

{¶ 14} The children's maternal grandmother, F.M., testified she and her husband live in a three bedroom mobile home.  T. at 12.  They have enough income to meet all of

their financial needs as well as the children's.  T. at 14.  She was aware of the oldest child having special needs, but the child was getting help and that would continue.  T. at 15. She could not testify to the child's special needs "because I don't know."  T. at 27.  She was not aware of any issues with the younger two children.  T. at 15.  She had sisters and sisters-in-law as a support system to help out.  *Id.*  She did not know the children's birthdates.  T. at 31.  She has visited with the children and they are bonded.  T. at 16. She never filled out paperwork seeking placement because "it happened so fast" and the original caseworker told her not to bother because they would not get the children.  T. at 19-20.  F.M. stated she had convictions for a DWI in 2009 and one in 2012, and a drug related charge, "but I went to rehab, I finished that, and I've been clean for five years."  T. at 20-21.  She no longer consumes alcohol.  T. at 21-22.  Her drug related charge was abusing harmful intoxicants in 2013.  T. at 22.  She denied having a substantiated physical abuse case with Children's Services when mother was a child, stating, "[t]hat went nowhere," "I never went to court for none of that."  T. at 23, 43.  She stated she has always wanted the children.  T. at 27.

{¶ 15} F.M.'s husband, E.M., testified he understood the oldest child had special needs as the child was autistic.  T. at 47.  He has visited with the children and they are bonded.  T. at 49-50.  He testified he was prepared to have the children in his home.  T. at 50.  However, in October 2018 and again just prior to the hearing, E.M. told the guardian ad litem he did not think it was feasible for him and his wife to care for the children.  T. at 55. Overnight he changed his mind.  *Id.*  He explained "there were doubts whether we would be able to handle them and everything, and she has guaranteed me

or promised me that she's had a change of heart and that she really wants to do it so I agreed with her." T. at 56. He did not know the children's birthdates. T. at 66.

{¶ 16} The children's maternal great aunt, C.A., testified she was aware that the oldest child had autism, and she would be able to meet the child's special needs. T. at 77. She lives in a three bedroom home with her husband and her seventeen year old child. T. at 78. She and her husband have enough income to meet all of their financial needs as well as the children's. T. at 79-80. She has a close bond with the oldest child because at one time, her older daughter was taking care of the child. T. at 81. She really did not know much about the youngest child. *Id.* The oldest child was removed because C.A.'s daughter failed to complete the required paperwork. T. at 85. The original caseworker asked C.A. to take a drug screen, but she refused. T. at 83. C.A. tried to visit with the children once a week until the oldest child was removed from her daughter's care. T. at 86-87. C.A. wanted the children, but did nothing to follow up because she was "waiting to hear what everything was going on because I'd been kinda of in the loop. I don't really know where the children are, what's going on with them." T. at 88. The guardian ad litem called C.A. and left two voice messages that she acknowledged receiving, but never returned his calls. T. at 92-93, 347-348. C.A. never had all three of the children over at the same time. T. at 95. She did not know the children's birthdates. T. at 101.

{¶ 17} The foster mother of the oldest child testified the child's been diagnosed with autism and cognitive delays. T. at 125, 129-130. She explained the child's behaviors and the in home treatment she provides for the child. T. at 126-127. She opined the child

"takes a lot of care, a lot of constant care and [the child's] always going to take a lot of constant care for the rest of [the child's] life."  T. at 128.

{¶ 18} Rebecca Inboden is the family's ongoing caseworker.  She testified the maternal grandmother would not be able to pass a home study because of her criminal history.  T. at 268.  Plus she had "demonstrated some fairly inappropriate and uncooperative behavior towards agency staff."  *Id.*  Maternal grandfather stated he could not care for the children by himself.  T. at 269.  Maternal great aunt "acknowledged that she had a history of substance abuse and that she had sought treatment for that."  T. at 269-270.  Appellee asked her to do a random drug screen, but she refused.  T. at 297.  There was also a concern that her husband had a domestic violence conviction in the past; therefore, C.A. and her husband would have been excluded as potential relative options for the children.  T. at 270.  C.A. was told she could visit with the children.  She visited in February of 2018, and did not return for any more visits.  T. at 300-301.  Ms. Inboden opined the relatives "would be probably very overwhelmed very quickly with the children's needs, and how young the children are, and how extensive the needs are, and the level of care that's involved."  T. at 300.

{¶ 19} In his decisions filed July 22, 2019, the magistrate noted several concerns with the maternal grandparents, the most notable was his concern with F.M.'s "apparent lack of knowledge about these children."  F.M. was not able to testify to the oldest child's special needs because she just did not know.  Given the foster mother's testimony as to this child's significant needs, it is apparent F.M. "has no real idea" as to what the child's needs are.  The magistrate noted this is especially important given the fact that the maternal grandparents "are on the fence about becoming permanent custodians for these

children."  They admitted to telling the guardian ad litem on more than one occasion that they could not care for the children, but changed their minds the night before the hearing. This was a concern as they "don't seem fully committed to taking on responsibility for these three children."  The magistrate concluded the following: "Given the hesitance of the two to take on this task, the scale of the task presented by three young [children] and the exceptional needs of [J.], the undersigned simply cannot see how this would work long-term.  For these reasons, the motion of Mr. and Mrs. [M.] for custody should be denied."

{¶ 20} The magistrate had the same concerns with C.A.  It was unclear whether she understood all that was involved in caring for the oldest child's special needs and add to that "the needs of caring for two other young children and it seems that Ms. [A.], though acting with good intentions, has not demonstrated that she is able and willing to take on these three children and meet their needs permanently."  The magistrate concluded her request for legal custody should be denied.

{¶ 21} Upon review, based upon a preponderance of the evidence presented as outlined above, we cannot say the trial court abused its discretion in denying the motions for legal custody.

{¶ 22} Assignment of Error I is denied.

II

{¶ 23} In his second assignment of error, father claims the trial court erred in finding clear and convincing evidence that the children's best interests would be best served by granting permanent custody to appellee.  We disagree.

{¶ 24} R.C.2151.414(B)(1) states permanent custody may be granted if the trial court determines, by clear and convincing evidence, that it is in the best interest of the child and:

> (a) The child is not abandoned or orphaned * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 25} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. *See In re Adoption of Holcomb,* 18 Ohio St.3d 361, 481 N.E.2d 613 (1985). "Where the degree of proof required to sustain an issue must be clear and convincing, a

reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross* at 477.

{¶ 26} R.C. 2151.414(E) sets out the factors relevant to determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Said section states in pertinent part the following:


(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have

substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(16) Any other factor the court considers relevant.

{¶ 27} R.C. 2151.414(D)(1) sets forth the factors a trial court shall consider in determining the best interest of a child:

(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services

agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 28} Father does not contest the fact that the children were placed in appellee's temporary custody on May 19, 2017, adjudicated on July 12, 2017, and the permanent custody hearings were held on February 15, and 22, 2019. As found by the trial court, the children have been in appellee's custody for over twelve months of a consecutive twenty-two-month period. R.C. 2151.414(B)(1)(d).

{¶ 29} Ms. Inboden testified the initial concerns with the family were domestic violence between mother and father, mental health concerns for mother, and substance abuse concerns for both parents. T. at 236-237. Father's case plan addressed mental health and substance abuse issues, and medical neglect of the children. T. at 237-238, 257. At the initial intake in May 2017, father tested positive for amphetamines,

methamphetamine, and THC.  T. at 258.  Father self-referred for substance abuse services at LAPP, but did not complete the program and his case was "closed non successful, uncompliant."  T. at 260-261.  Father's substance abuse continued to be an ongoing problem.  He tested positive for drugs on multiple random drug screens, and refused drug screens on at least two occasions.  T. at 244-245, 259-260, 281-282, 313-314.  Father's substance abuse remains a concern.  T. at 261.

{¶ 30} As for mental health, father had a past diagnosis of PSTD which he felt was no longer relevant.  T. at 262.  Also, there was a concern of domestic violence.  *Id.*  Father never produced verification of undergoing any mental health evaluation.  T. at 263, 311.  Father's mental health remains a concern.  *Id.*

{¶ 31} Father's parenting skills were an issue as the two older children had developmental delays i.e., difficulties with speech, articulation, communicating.  T. at 250, 263.  Father attended one or two classes at Heartbeats, a pregnancy and parenting support facility, but did not follow through.  T. at 263-264.  Father's parenting skills remain a concern.  T. at 264.

{¶ 32} Father's employment and housing were not an issue until he and mother separated and he moved to North Carolina to live with his brother.  T. at 264-265.  Father provided verification of employment in North Carolina.  T. at 265.

{¶ 33} Father regularly visited with the children and the visits went "[v]ery well," he was "very attentive and engaged with the kids."  T. at 266.  He even traveled from North Carolina for visitations.  T. at 199, 303.

{¶ 34} The children were in foster care and were making remarkable progress.  T. at 266-268.  Their basic and special needs were being met, and their respective foster parents wanted to adopt them.  T. at 114, 128-129, 266, 268, 309.

{¶ 35} Ms. Inboden stated the case plan services have not been completed and "what has been attempted, doesn't appear to be sufficient to alleviate the concerns or provide any reassurance that the children's needs will be met and they'll be safe."  T. at 274.

{¶ 36} Scott Sidner is the guardian ad litem.  He testified he observed visits between father and the children and they went "[r]eally well."  T. at 338-339.  He could tell father "loved the kids and vice versa."  T. at 340-341.  Father responded appropriately to the children's behaviors and redirected the children when necessary.  T. at 340.  He "was doing really well in the last part of the visits, not just his section but coming there and interacting with the kids and everything."  T. at 341.  However, he did not believe father was capable of meeting the basic and special needs of the children.  T. at 357.  It was his opinion that granting permanent custody to the agency would be in the children's best interests.  T. at 358.

{¶ 37} Father testified at the time of the hearing, he and mother had been separated for eight months.  T. at 197-198.  He lived in North Carolina with his brother and his family in a rented home.  T. at 197.  He travels to Ohio every two weeks to visit with the children.  T. at 199.  He acknowledged that he was given a copy of the case plan, and understood what was required: maintain employment/income, substance abuse assessment and treatment, and mental health counseling.  T. at 200-201.  He was currently employed and received disability income.  T. at 199-200, 206.  He completed

LAPP education, but did not follow up on recommended services because "I wanted to get something that showed a completion, a certificate." T. at 201-202. Instead he completed an online program through Open Path. T. at 202; Father's Exhibit B. However, he admitted to testing positive for illegal substances after completing the program and using marijuana in the past few months prior to the hearing. T. at 202-203. He did not refuse one of the drug screens, he just wanted to wait "to allow the time to actually have to urinate." T. at 320, 330-331. He received a mental health discharge from the VA in 2015. T. at 326-327; Father's Exhibit C. He did not seek any additional mental health evaluation other than ongoing reevaluation with a VA therapist "just to see if there's any need for any further concern. They deemed nothing at that point. That there was no further concern for any continuous evaluation." T. at 203-204, 327-328. He felt his continuous involvement with the VA was satisfactory. T. at 328. He stated he took an online parenting class. T. at 209, 324-326; Father's Exhibit A. Although the oldest child was not his child, he consider the child to be his, and was aware of the child's special needs. T. at 204. Father stated Ms. Inboden had told him that he would never get his children back as long as he stayed with mother. *Id.*

{¶ 38} On the issue of permanent custody regarding father, the magistrate found the children had been in the agency's temporary custody for twenty months of a consecutive twenty-two month period, and father "has also made minimal progress" on his case plan objectives. *See* Magistrate's Decisions filed July 22, 2019. While he did engage in mental health services through the VA, participated in an online program for substance abuse, and took an online parenting class, he admitted to continued "substance abuse through much of the case." He did not have independent housing and

lived out of state.   The magistrate found father "may be worse off than when the case started as well."  The magistrate further noted because father now lives in North Carolina, the Interstate Compact for the Placement of Children (hereinafter "ICPC") applied in this case.  As quoted by the magistrate, Article VI(A) of the ICPC states, " 'no child subject to this compact shall be placed into a receiving state until approval for such placement is obtained.' "  Article VI(B) states if " 'the public child placing agency in the receiving state does not approve the proposed placement then the child shall not be placed.' "  The trial court did not receive any such approval from North Carolina; therefore, the magistrate could not recommend an order of placement with father.  The magistrate recommended the termination of parental rights, and determined "the best way for these children to achieve stability and permanency is through adoption."  The magistrate recommended permanent custody of the children to the agency.  By judgment entries filed October 1, 2019, the trial court denied father's objections and approved and adopted the magistrate's decisions.

{¶ 39} As explained by our brethren from the Second District in *In re A.J.S. & R.S.,* 2d Dist. Miami No. 2007CA2, 2007-Ohio-3433, ¶ 22:

Accordingly, issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact.  In this regard, "[t]he underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered

testimony." *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. Finally, an appellate court must adhere to every reasonable presumption in favor of the trial court's judgment and findings of fact. *In re Brodbeck,* 97 Ohio App.3d 652, 659, 647 N.E.2d 240, citing *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 226, 1994-Ohio-432, 638 N.E.2d 533.

{¶ 40} Further, " 'the discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.' " *In re Mauzy Children,* 5th Dist. Stark No. 2000CA00244, 2000 WL 1700073, *2 (Nov. 13, 2000), quoting *In re Awkal,* 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994).

{¶ 41} From the testimony, it is clear that father loves his children and wishes to parent them. However, the evidence is also clear that despite the services and caseworkers available to him for some twenty-one months, he has not been able to maintain the services and/or successfully complete them. The children are thriving in their respective foster homes and appear to be healthy and happy. Given the evidence presented, it is impossible for this court to second guess the trial court. As stated above, credibility, reliability, and forthrightness are within the province of the trier of fact.

{¶ 42} Upon review, we find sufficient clear and convincing evidence to support the trial court's decisions to terminate father's parental rights and grant permanent custody of the children to the agency.

{¶ 43} Assignment of Error II is denied.

{¶ 44} The judgments of the Court of Common Pleas of Licking County, Ohio are hereby affirmed.

By Wise, Earle, J.

Delaney, P.J. and

Baldwin, J. concur.

EEW/db