**[Cite as *In re A.B.*, 2023-Ohio-589.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: A.B.            :       APPEAL NO. C-220577
                                        TRIAL NO.    F13-1249Z

                                               :

                                               :         *O P I N I O N.*

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 1, 2023

*Jon R. Sinclair*, for Appellant Father,

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Nicholas C. Varney*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Masha Pupko*, Assistant Public Defender, for Appellee Guardian ad Litem.

CROUSE, **Presiding Judge.**

{¶1}    Appellant father appeals from the decision of the Hamilton County Juvenile Court awarding permanent custody of his daughter, A.B., to appellee the Hamilton County Department of Job and Family Services ("HCJFS"). Father argues that the court's best-interest findings were not supported by sufficient evidence.[1] For the reasons set forth below, we affirm the decision of the juvenile court.

### I. Factual and Procedural History

{¶2}    A.B. was born in 2011 in Florida to mother and father. Mother brought A.B. to Cincinnati, Ohio, in 2013. Father lost contact with mother and A.B. around the same time and did not see A.B. again until 2020, after the commencement of this case.

{¶3}    A.B. has a history of mental-health concerns and developmental delays. In October 2019, A.B. was hospitalized due to physical aggression and threats of self-harm. According to a psychological evaluation performed in October 2020, A.B. has been diagnosed with mild-to-moderate intellectual disability, disruptive mood dysregulation disorder, and other specified trauma-and-stressor related disorder. A.B. is on a prescribed regimen of medication to help with managing her behavior.

{¶4}    A.B. was in the temporary custody of HCJFS in 2013, 2017, and 2018 based on various factors related to mother's chronic homelessness, mental-health concerns, and domestic-violence issues. In April 2019, legal custody of A.B. was remanded to her mother, and HCJFS ended its protective supervision of A.B. in July 2019.

{¶5}    In August 2019, following a report from A.B.'s school and a home visit by a caseworker, HCJFS was once again granted interim custody of A.B., who was

---

[1] Mother, who had custody of A.B. prior to the instant proceedings, is not a party to this appeal.

placed in foster care. In November 2019, A.B.'s guardian ad litem ("GAL") filed for permanent custody to HCJFS on the basis that A.B. could not or should not be placed with her parents (R.C. 2151.414(B)(1)(a)); had been abandoned by father (R.C. 2151.414(B)(1)(b)); and had been adjudicated as an abused, neglected, or dependent child on at least three separate occasions (R.C. 2151.414(B)(1)(e)). Subsequent to the GAL's filing, father began participating in this case. The GAL requested, and the court granted, a continuance so that a home study could be conducted for father, pursuant to the Interstate Compact on the Placement of Children ("ICPC"). In January 2020, the juvenile court adjudicated A.B. neglected and dependent.

{¶6}   Throughout 2020, HCJFS worked to provide services to mother and father, with the goal of placing A.B. in the custody of one of her parents. In early 2020, HCJFS reported receiving an approved ICPC home study for father, and the matter was continued to evaluate the impact of the approved home study on the parties' positions. In August 2020, the GAL withdrew the motion for permanent custody and instead moved for temporary custody while attempting to make progress on A.B.'s case plan for reunification. The court granted temporary custody of A.B. to HCJFS.

{¶7}   The September 2020 case plan allowed A.B. to visit father monthly at his home in Georgia and provided mother an opportunity to make improvements to her living situation. The goal of this case plan was to reunite A.B. with one of her parents by August 2021. This case plan included provisions requiring A.B. to "participate in mental-health services and follow all recommendations" and to "participate in med-somatic services and follow all recommendations." The case plan documented father's need to "keep open and consistent contact between himself and [A.B.] to develop an attachment" and "display an[] understanding that there is a need

for [A.B] [to] have mental-health and emotional interventions." The case plan also required father to "participate via phone/video to keep involved in the mental-health treatment of [A.B.]," "engage with [A.B.]'s treatment providers to continue understanding and being able to meet mental-health, cognitive and emotional needs," and "commit to continuing visitation between him and [A.B.]."

{¶8} In September 2020, A.B. went with her caseworker to Georgia to visit father for a week. During that visit, father refused to give A.B. her medications because he does not believe in the use of psychotropic medications. After this visit, HCJFS suspended any further visits to Georgia, but offered father the opportunity to visit A.B. in Ohio. Father never visited A.B. in Ohio, but father did visit A.B. in person at some subsequent time when A.B.'s foster family vacationed in Tennessee. The two visits in Georgia and Tennessee are the only times father and A.B. have seen each other in person since 2013.

{¶9} In October 2020, after A.B.'s visit with father in Georgia, HCJFS submitted a new case plan. The new case plan discontinued unsupervised visits between father and A.B., noting that father had thrown out A.B.'s medication during unsupervised visitation and refused to follow treatment plans recommended by A.B.'s service providers. The case plan also documented that A.B. returned to her foster family after the visit "with negative behaviors and unregulated temperament." The plan called for father to "commit to continuing visitation between him and [A.B.]"

{¶10} In January 2021, the juvenile court held a remote hearing on HCJFS's motion to extend temporary custody. Mother and father both attended the hearing, along with counsel. Father agreed with the motion and agreed to virtual visitation facilitated through the Family Nurturing Center ("FNC"). The court also noted that

"Father's ICPC Home Study has expired and [Georgia] wishes him to engage in services and identify appropriate services for [A.B.] in [Georgia]." The court observed that father "indicates a strong desire to engage in [A.B.]'s services so that he can better understand her needs." The court granted HCJFS's motion to extend temporary custody through February 2021, with the goal of reunifying A.B. with one of her parents.

{¶11} In February 2021, HCJFS filed an updated case plan. The updated case plan required father and his wife "to complete parenting education centered around children with special needs. And to complete a mental-health evaluation." The case plan shows that father participated by phone in developing the plan and had agreed with it.

{¶12} The court extended temporary custody in March 2021 at the request of HCJFS. In July 2021, HCJFS filed a "Semiannual Administrative Review" ("SAR") of A.B.'s case plan. In the SAR, HCJFS reported that father was continuing with virtual visits with A.B., mediated through the FNC. Despite having been provided with contact information for A.B.'s service providers, father had not engaged with any of A.B.'s providers. Father reported that he had not enrolled in parenting classes or pursued a mental-health evaluation, citing cost and lack of local availability as barriers. HCJFS reported that, although father has reported to the caseworker that he will "comply" with HCJFS and the caseworker, he has not "shifted his thinking or behavior to reflect truly understanding [A.B.] and what her mental-health and emotional and cognitive needs are." HCJFS summarized that father has displayed no understanding or acknowledgement of A.B.'s diagnoses by licensed mental-health professionals, nor has he displayed any willingness to keep A.B. in mental, emotional, and cognitive services

5

or to follow her medication prescriptions.

{¶13} Following the July 2021 SAR, HCJFS filed its motion for permanent custody. In its motion, HCJFS claimed that A.B. had been in the temporary custody of the agency for at least 12 months of the preceding 22 months and that permanent custody was in A.B.'s best interest.

{¶14} In January 2022, A.B.'s GAL filed a permanent-custody report and recommendation. In her report, the GAL noted that father had not completed any of the steps outlined in the case plan, including the completion of a mental-health assessment and a parenting class focused on special-needs children. Additionally, the GAL emphasized father's lack of commitment to meeting A.B.'s mental-health needs that were documented in A.B.'s psychological evaluation. Further, the GAL reported that father does not respond appropriately to A.B.'s mental-health needs and account for her cognitive delays during their supervised phone calls. The GAL concluded that granting permanent custody to HCJFS would be in A.B.'s best interest.

{¶15} On July 6, 2022, the juvenile court held a trial on HCJFS's motion for permanent custody before a magistrate. Father did not appear, although father's attorney participated. The court heard testimony from A.B.'s caseworker, Tamyiah Terrell. Terrell testified about A.B.'s history of mental-health concerns. Terrell stated that father withheld A.B.'s medication during the visit in Georgia and that father does not believe in the use of psychotropic medication because of his faith. Terrell testified that father and his wife did not complete a mental-health assessment or engage in parenting classes, as was required by the case plan. Terrell testified that father had been given permission to visit A.B. in Ohio, under the supervision of the FNC, but that father had refused to come. Terrell testified that it was her belief that there was no

bond between A.B. and father. She stated that A.B. would describe phone calls with father as "okay" and simply state, "Yeah, I talked to him."

{¶16} The magistrate entered a decision finding that clear and convincing evidence supported HCJFS's motion for permanent custody and awarded permanent custody to the agency. The magistrate's decision addressed all of the statutory factors, weighing each in favor of permanent custody.

{¶17} Following the magistrate's decision, father filed an objection, arguing that the decision to terminate his parental rights was not based on sufficient evidence. The court held a hearing on the objection in September 2022. Once again, father did not appear, but he was represented by counsel. Father advanced no specific argument as to why the magistrate's decision was not based on sufficient evidence, other than the conclusory allegation. Following the hearing, the court entered an order overruling father's objection to the magistrate's decision. The juvenile court adopted the magistrate's decision and also found that each of the statutory factors favored permanent custody.

{¶18} Father timely appealed.

## II. Analysis

{¶19} In his sole assignment of error, father argues that the juvenile court erred when it granted permanent custody of A.B. to HCJFS. Specifically, father argues that the court's finding that permanent custody was in A.B.'s best interest was not supported by sufficient evidence. We disagree.

{¶20} R.C. 2151.414(B)(1) provides that the juvenile court may grant permanent custody of a child to a public children services agency if the court finds by clear and convincing evidence that (1) permanent custody is in the child's best interest

and (2) that one of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies. *In re P/W Children*, 1st Dist. Hamilton No. C-200103, 2020-Ohio-3513, ¶ 29. "To determine the best interests of the child, the court must consider all relevant factors within R.C. 2151.414(D)(1)." *In re Z.*, 1st Dist. Hamilton No. C-190026, 2019-Ohio-1617, ¶ 18.

{¶21} On a challenge to the sufficiency of the evidence in a permanent-custody case, the reviewing court "tak[es] a fresh look at the evidence to see whether it clearly and convincingly supports the court's decision." *In re M/E*, 1st Dist. Hamilton No. C-200349, 2021-Ohio-450, ¶ 8. Clear and convincing evidence is evidence that " 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.' " *In re L.H.*, 1st Dist. Hamilton No. C-220161, 2022-Ohio-2755, ¶ 38, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). "[W]e accept the trial court's factual determinations if they are supported by 'some competent and credible evidence.' " *In re M/E* at ¶ 8, quoting *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46.

{¶22} In evaluating the best interests of the child, the court must consider all of the enumerated factors under R.C. 2151.414(D)(1), and " '[t]here is not one element that is given greater weight than the others pursuant to the statute.' " *In re K.T.1*, 1st Dist. Hamilton Nos. C-170667, C-170687, C-170701, C-170702 and C-170707, 2018-Ohio-1381, ¶ 13, quoting *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

{¶23} R.C. 2151.414(D)(1) provides that when making a best-interest determination, "the court shall consider all relevant factors, including, but not limited to, the following":

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers[, and others];

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶24} We first note that the record in this case shows that, while an ICPC home study had been approved, it ultimately expired. A subsequent home study was denied.

{¶25} The lack of an approved ICPC home study prevents a permanent placement with father. Because father lives in Georgia, the ICPC is applicable to this case. Under the ICPC, as codified in Ohio law at R.C. 5103.23 to 5103.237, "The child *shall not* be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." (Emphasis added.) R.C. 5103.23, Article III(D).

{¶26} Because HCJFS did not have an active approval from the appropriate agency in Georgia to place A.B. with father, the juvenile court could not place A.B. with father. *See In re E.H.*, 5th Dist. Licking Nos. 2019 CA 00108, 2019 CA 00109 and 2019 CA 00110, 2020-Ohio-2835, ¶ 38 (holding that the ICPC prevents an interstate

9

placement where the receiving state has not given approval to the placement); *In re Ranker*, 11th Dist. Portage No. 99-P-0072, 2000 Ohio App. LEXIS 4662, 33 (Oct. 6, 2000) (same).

{¶27} Despite the lack of an approved ICPC home study, the juvenile court analyzed the best-interest factors.

{¶28} The juvenile court considered the relationships between A.B. and mother, father, and the foster family. The court found that father had not had any relationship with A.B. between 2013 and 2020. At the August 2020 dispositional hearing, the parties agreed to a plan with the goal of reunification with one of A.B.'s parents. Father was to regularly visit A.B. to develop a bond. However, father only had two in-person visits with A.B., one at his home in Georgia and one while A.B.'s foster family vacationed in Tennessee. Father refused to visit A.B. in Ohio because, he stated, he couldn't be away from his ministries. Father repeatedly told the caseworker that he had not had a chance to look at A.B.'s psychological evaluation and did not participate in any other services offered. Father had regular phone and video calls with A.B. However, the uncontroverted testimony of A.B.'s caseworker was that A.B. had not formed a bond with father.

{¶29} In contrast, A.B. was bonded with her foster family. The foster family supported A.B. through her challenging behaviors, and A.B. has made substantial improvement in her behavior since living with the foster family.

{¶30} The juvenile court also considered A.B.'s wishes, as relayed by her *In re Williams* attorney. *See In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110. A.B. wanted to reunify with mother, but was also happy in the foster home. A.B. did not express an interest in being placed with father.

{¶31} Next, the juvenile court considered A.B.'s custodial history. At the time of the permanent-custody trial, A.B. had been in custody of HCJFS for 32 months and one week, from the time she was eight years old until she was 11 years old.

{¶32} The juvenile court placed significant emphasis on A.B.'s need for a legally secure permanent placement. As we have previously stated, "A legally secure placement refers to more than just a roof over one's head, rather, a legally secure placement, ' "encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." ' " *In re E.H.*, 1st Dist. Hamilton Nos. C-220424 and C-220428, 2022-Ohio-4701, ¶ 24, quoting *In re P. & H.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, at ¶ 42, quoting *In re K.W.*, 2018-Ohio-1933, 111 N.E.3d 368, ¶ 87 (4th Dist.) ("Mother's failure to comply with her case plan, along with the presence of grandmother [who was suspected of abusing drugs] at the home, provided clear and convincing evidence that mother was unable to provide a legally secure permanent placement."); *see In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 95 (record supported a finding that parents were unable to provide a legally secure placement where parents were not grasping parenting concepts and were not truthful in mental-health evaluations.).

{¶33} The juvenile court found that father has stable housing and income sufficient to meet A.B.'s needs. However, father does not have a close relationship with A.B. Father does not believe that A.B. needs mental-health treatment, despite discussion with A.B.'s caseworker, participation in A.B.'s psychological evaluation, and being provided with A.B.'s psychological assessment. Father has stated that he can address A.B.'s needs through structure and discipline. Father did not participate in case-plan services, and despite multiple continuances, father did not appear at the

permanent-custody trial or the hearing on his objection to the magistrate's decision. Father did not attend a parenting class for parents of special-needs children, as directed by the case plan. The juvenile court also found that father's ICPC home study was not approved. Thus, the juvenile court found that father cannot provide A.B. with a permanent placement that would meet her unique needs.

**{¶34}** Finally, the juvenile court determined that none of the factors under R.C. 2151.414(D)(1)(e) were applicable to this case.

**{¶35}** Upon review, we conclude that there was clear and convincing evidence to support the juvenile court's decision to grant permanent custody of A.B. to HCJFS. The lack of an approved ICPC home study for father makes placement with father impossible. The juvenile court also properly considered all of the best-interest factors under R.C. 2151.414(D)(1). Four of the five factors support permanent custody to HCJFS, and none of the factors suggest that placement with father is in A.B.'s best interest.

### III. Conclusion

**{¶36}** For the foregoing reasons, we overrule father's sole assignment of error. Accordingly, we affirm the judgment of the juvenile court.

Judgment affirmed.

**ZAYAS** and **BOCK, JJ.**, concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.