[Cite as *In re C/S Children*, 2025-Ohio-1639.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: C/S CHILDREN

:

:

:

:

:

APPEAL NOS. C-250018
                  C-250026
                  C-250041
TRIAL NO.    F/19/1267 X



*JUDGMENT ENTRY*

This cause was heard upon the appeals, the record, the briefs, and arguments.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 5/7/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

IN RE: C/S CHILDREN        :        APPEAL NOS. C-250018
                                                C-250026
                           :                    C-250041
                                    TRIAL NO.   F/19/1267 X
                           :

                           :

                           :        *O P I N I O N*


Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 7, 2025


*Alex van der Zee,* for Appellant Mother,

*Cynthia S. Daugherty*, for Appellant F.C.S.,

*ProKids, Inc.*, and *Jeffery A. McCormick*, for Appellant Guardian ad Litem,

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Patsy A. Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**MOORE, Judge.**

**{¶1}** Appellants Mother, Guardian ad Litem ("GAL"), and F.C.S., putative father of one of the children, appeal the Hamilton County Juvenile Court's judgment adopting the magistrate's decision and awarding appellee the Hamilton County Department of Job and Family Services ("HCJFS") permanent custody of F.C. and L.S. For the reasons set forth below, we affirm the juvenile court's judgment.

## I. Factual and Procedural History

**{¶2}** This case began in September 2019, when HCJFS filed a complaint alleging that Mother had neglected and rendered F.C. (born in 2017) and L.S. (born in 2015) dependent. HCJFS also alleged that Mother's three other minor children were also dependent. The other children, however, are not at issue in this case.

**{¶3}** At the time of the complaint, Mother and her five minor children lived with her parents in Cincinnati, Ohio. The complaint alleged that Mother left the children alone for days, that F.C. was twice seriously injured because of inadequate supervision, and Mother's paramour, F.C.S., was abusive towards her. The complaint also alleged that Mother abused drugs and was an addict, and that her home was unfit for habitation due to numerous hazards. The complaint stated that the children's legal father (now Mother's ex-husband) lives out of state and has no interest in continuing a relationship with either Mother or the children. Mother and F.C.S. believe that F.C. is F.C.'s biological father and F.C.S. is listed as the father on F.C.'s birth certificate.[1] But no tests have been performed to establish F.C.S. as the biological father or disestablish the paternity of the legal father.

**{¶4}** Attached to the complaint were stipulations from Mother asserting that

---

[1] Since the name of the alleged father and child are the same, "S" is included to identify the alleged father as "F.C. Senior" or "F.C.S."

F.C.S. had beaten her in the past, bound her to a tent, kidnapped F.C., and stolen her car. Following the day-one hearing, the magistrate granted interim custody of the five children to HCJFS. In January 2020, the children were adjudicated dependent and placed into the temporary custody of HCJFS.

{¶5} The magistrate granted HCJFS's August 2020 and February 2021 motions to extend the grant of temporary custody of F.C. and L.S. Between September 2020 and June 2021, Mother did not visit or otherwise engage in any way with either child. From June 2021 forward, Mother re-engaged with visitation services, and began to visit F.C. and L.S.

{¶6} On August 9, 2021, HCJFS moved to modify custody, from temporary to permanent. Then, in late August, F.C. and L.S.'s three other siblings were placed with T.B., their biological father. T.B. took the initial steps to receive ICPC approval for F.C. and L.S. but later reported that he would not be able to care for the two additional children because he lacked the capacity to handle the logistics of caring for that many children.

{¶7} From August 2021 until April 2024, the permanent-custody trial was delayed by numerous motions and continuances. While the children were in HCJFS's custody, Mother moved to Kentucky.

{¶8} To determine if F.C. and L.S. could be returned to her, an Interstate Compact on the Placement of Children ("ICPC") referral was required because Mother now lived in Kentucky. On three separate occasions, the court directed HCJFS to make an ICPC referral. On June 30, 2022, the Kentucky Cabinet for Health and Family Services ("KCHFS") returned the first referral, stating that it "cannot process the request" because it had been reported that Mother was not engaged in therapy.

{¶9} On November 30, 2022, KCHFS denied the second referral, stating that

Mother could not be approved until Mother's visitation rights progressed to unsupervised. At the time, Mother's visitation rights were restricted to supervised community visitation.

{¶10} The third referral was denied on January 7, 2024. In its denial, KCHFS cited two concerns. First, the report noted that Mother had lost her job and lacked stable income. KCHFS feared that Mother would be unable to adequately provide for F.C., L.S., and the two other children living with her. Second, the report noted that there was an ongoing investigation into an alleged domestic disturbance at Mother's home. KCHFS's report concluded that it could process another referral if Mother's financial situation were to change and if she could demonstrate that her home was safe. Around the same time as its third denial, HCJFS restricted Mother's visitation with F.C. and L.S. to supervised visitation.

{¶11} In May 2022, D.B., the alleged biological father of L.S., made his first appearance. D.B. lived in Kentucky, had no relationship with L.S., and did not want custody of L.S. Instead, D.B. deferred to what the court believed was in the children's best interests. On February 2024, F.C.S. petitioned for custody of L.S. as a nonparent.

{¶12} On April 29, 2024, the trial commenced on HCJFS's permanent-custody motion. The agency first called Madelynn Yeager, the caseworker assigned to F.C. and L.S.'s case. Yeager recalled that Mother had progressed with the case plan's objectives by engaging in counseling and substance-abuse treatment and by maintaining consistent visitation with the children. Yeager, however, also testified that the agency had ongoing concerns with Mother's relationship with F.C.S.

{¶13} Yeager explained that Mother had claimed that she and F.C.S. were not in contact with one another. But, Yeager observed F.C.S. at Mother's home while conducting a surprise home visit in February 2023. Yeager also testified that in

December 2023, the agency became aware of a September 2023 incident in which police were called to Mother's home. Specifically, a neighbor called police about an argument between Mother and F.C.S. that started outside Mother's home and then continued inside.

**{¶14}** Yeager also explained that the agency had concerns about F.C.S.'s sobriety, his alleged history of abusing Mother, his failure to engage in agency services, and his limited interaction with the children—he had only visited F.C. and L.S. twice while they were in agency custody.

**{¶15}** At the conclusion of the first trial date, the magistrate heard oral arguments on Mother's request for an expedited ICPC to be completed. Mother filed a motion 40 minutes before the start of trial, requesting that the magistrate order HCJFS to initiate a fourth ICPC referral. Mother's counsel argued that all outstanding concerns with Mother assuming custody of the children had been remedied, since Mother had secured stable employment and had proof that the September 2023 domestic disturbance was unsubstantiated. HCJFS argued that it would be improper to make a fourth referral in the case.

**{¶16}** The magistrate found that Mother's motion was untimely and declined to order HCJFS to make another ICPC referral. However, the magistrate stated her entry denying the motion did not preclude HCJFS from making a fourth ICPC referral if it chose to.

**{¶17}** On July 18, 2024, the trial resumed and HCJFS's counsel recalled Yeager. Yeager explained the agency was not going to make a fourth ICPC referral, unless a court ordered it to do so. Yeager explained that a fourth referral was inappropriate, given that three others had previously been denied. Yeager testified that the agency doubted whether Mother had remedied the causes of the third denial.

**{¶18}** Yeager testified that both Mother and the GAL asserted that F.C.S. did not assault her during the September 2023 incident when police were called to Mother's home. Despite these assurances, Yeager testified that the agency still had other concerns, including Mother's ability to earn a stable income.

**{¶19}** Yeager explained that Mother's employability was limited by her obligation to transport F.C.S., F.C.S.'s mother, and one of her other children to medical appointments. While Mother had made progress in satisfying the case-plan objectives, Yeager concluded that the agency would not make a fourth referral.

**{¶20}** Yeager also testified about her interactions with F.C.S. Yeager recalled that she made an ICPC referral for F.C.S. but that the referral was not processed because he had not engaged in any agency services. Yeager explained that she needed F.C.S. to sign a release of information before she could make a diagnostic referral, but that he would continually cancel meetings with her, and he never attempted to engage with the agency.

**{¶21}** On July 31st, Mother called her three supporting witnesses. Lauren Jones, a KCHFS employee, testified that she had reviewed Mother's third ICPC referral and had concerns about Mother's income and the September 2023 domestic disturbance. Jones stated that KCHFS's policy required that Mother could not be approved while the investigation into the September 2023 incident was ongoing. Jones stated that the agency could process another ICPC referral if Mother could prove that she had stable income and if the investigation found that the domestic-abuse claim was unsubstantiated.

**{¶22}** The children's GAL recommended that custody of the children be remanded to Mother. The GAL testified that she had worked on the case since its inception, and that she believed it was in the children's best interest to return to their

Mother's care. The GAL testified that Mother has maintained sobriety, stable employment, and housing, and has built strong bonds with the children. In addition, the GAL explained that the children wanted to return to Mother, that Mother continued to participate in therapy, and that she has been engaged with the children's school and their foster parents.

**{¶23}** Mother also called Savannah McCarty, a KCHFS caseworker who investigated the September 2023 domestic disturbance. McCarty testified that she interviewed Mother, F.C.S., and Mother's other children living at the home, in addition to conducting a home visit. McCarty concluded that the allegation was unsubstantiated, that there was no evidence that F.C.S. struck Mother or that F.C.S. was regularly there, and that the agency would process another ICPC for Mother.

**{¶24}** On August 15, 2024, the magistrate awarded HCJFS permanent custody of F.C. and L.S. The magistrate made specific findings that neither Mother nor F.C.S. remedied the concerns that prompted the children to be placed in agency custody. The magistrate conducted an analysis of the R.C. 2151.414(D)(2) factors and concluded the court was mandated to make a permanent-custody award to the agency.

**{¶25}** The magistrate made further discretionary findings that awarding HCJFS permanent custody was in the children's best interest. The magistrate's findings considered the factors listed in R.C. 2151.414(D)(1)(a)-(e) and 2151.414 (E). The magistrate determined that while the children were bonded with Mother and wanted to be with her, Mother and F.C.S. had abandoned the children. The magistrate further determined that the children could not be placed with either parent in a reasonable amount of time, because neither Mother nor F.C.S. had ICPC approval. The magistrate further detailed that the agency had outstanding concerns with the alleged history of domestic abuse between Mother and F.C.S., Mother's fabricated

claims that F.C.S. held her hostage and drugged her, Mother's untruthfulness in whether she has communicated with F.C.S., and F.C.S.'s history of substance abuse and failure to engage in agency services.

**{¶26}** Further, the magistrate stated that given the duration that the children were in the temporary custody of HCJFS, the court lacked the statutory authority to stay the proceedings and order HCJFS to make a fourth ICPC referral. The magistrate noted that Mother had cited no authority that compelled the agency to make an additional referral following a denial.

**{¶27}** Mother, F.C.S., and the GAL objected to the magistrate's findings. The parties collectively argued that the magistrate's conclusion was not supported by sufficient evidence, was against the manifest weight of the evidence, and was not in the children's best interest. Mother's and the GAL's objection asserted that the magistrate improperly failed to order HCJFS to make a fourth ICPC referral. F.C.S.'s objection specifically argued that Mother, as a biological parent, did not require ICPC approval prior to placement with her.

**{¶28}** On January 3, 2025, the juvenile court approved and adopted the magistrate's decision in part. The court determined that the magistrate's finding that an award of permanent custody was statutorily mandated was not supported by caselaw. The court, however, agreed with the magistrate's analysis of the discretionary best-interest factors and determined that a grant of permanent custody to HCJFS was in the children's best interest. The court found that the magistrate properly refused to order HCJFS to issue a fourth ICPC referral, and that the court could not remand custody to Mother without ICPC approval.

**{¶29}** Mother, F.C.S., and the GAL timely appealed.

### II.    Analysis

**{¶30}** Appellants each raise one assignment of error on appeal, asserting that the trial court's award of permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence.

### A.  Sufficiency and Manifest Weight

**{¶31}** Our review of the juvenile court's termination of parental rights turns on whether the court's decision was supported by clear and convincing evidence. *In re Ar. L.*, 2024-Ohio-231, ¶ 24 (1st Dist.).  "Clear and convincing evidence is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id.*, quoting *In re S.W.*, 2023-Ohio-2210, ¶ 11 (1st Dist.).

**{¶32}** With respect to our review of whether the court's judgment was supported by sufficient evidence, we review sufficiency arguments in the permanent-custody context by independently reviewing the evidence to determine if the juvenile court's decision was supported by clear and convincing evidence. *In re K.D.*, 2024-Ohio-5582, ¶ 48 (1st Dist.).

**{¶33}** In reviewing whether the court's judgment was against the manifest weight of the evidence, "we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether—in resolving the conflicts in the evidence—the juvenile court clearly lost its way. . . ." *In re Ar. L.* at ¶ 25.

**{¶34}** A juvenile court's termination of an individual's parental rights is governed by R.C. 2151.414. *In re S/F Children*, 2025-Ohio-822, ¶ 36 (1st Dist.).  The juvenile court must make two findings before awarding permanent custody to the state agency.  First, the court must have found that one of the R.C. 2151.414(B)(1)(a)-(e) and

2151.414(E) factors applies. *See In re Ar.L.*, 2024-Ohio-231, at ¶ 26 (1st Dist.). Second, the court must have found that awarding the agency with permanent custody was in the in child's best interest under R.C. 2151.414(D)(1)(a)-(e). *Id.*

**{¶35}** Here, the juvenile court determined that the children were eligible for permanent custody to HCJFS, finding that R.C. 2151.414(B)(1)(b) and)(d) were satisfied.

**{¶36}** R.C. 2151.414(B)(1)(b) provides that a child is eligible for permanent-custody placement if the child has been abandoned. R.C. 2151.011(C) presumes that a child is abandoned when a parent has failed to maintain contact for more than 90 days.

**{¶37}** R.C. 2151.414(B)(1)(d) establishes that a child may be placed in the permanent custody of the state agency if the child has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period.

**{¶38}** The trial court appropriately determined that the circumstances in this case satisfied both requirements. First, the children have been in the temporary custody of HCJFS since 2019, well beyond the 12-of-22 month minimum required under R.C. 2151.414(B)(1)(d). This finding renders consideration of the (B)(1)(b) factor moot.

**{¶39}** However, even if the (B)(1)(d) factor did not apply, the juvenile court appropriately concluded the children had been abandoned. This court has determined that parents may rebut the presumption of abandonment by putting forth evidence that their absence was justified. *In re P/W Children*, 2020-Ohio-3513, ¶ 36-37 (1st Dist.) (finding a parent's failure to justify four years without visiting his or her child did not rebut the presumption of abandonment); *compare In re Custody of C.E.*, 2005-Ohio-5913, ¶ 15 (2d Dist.) (finding that a parent rebutted the presumption of abandonment by showing her absence and lack of contact was to avoid a physically

violent estranged partner). The presumption of abandonment remains even if the parent resumes contact after 90 days. *See In re A.D.*, 2022-Ohio-2346, ¶ 24 (1st Dist.).

**{¶40}** Here, the juvenile court found that Mother did not visit the children from September 9, 2020, until June 2, 2021. The record also shows that Mother could have contacted either child during this period but chose not to. While Mother asserts that she has now rekindled a meaningful relationship with her children, this claim alone is insufficient to rebut the presumption that she abandoned the children. Similarly, the court found that F.C.S. last visited the children in agency care in July 2020. Neither Mother nor F.C.S. introduced evidence to justify their absence.

**{¶41}** Turning to the second prong, the court appropriately concluded that permanent custody with the agency was in the children's best interest. The juvenile court considered the R.C. 2151.414(D)(1) best-interest factors, which include

(a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period;

(d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.

(e) whether any factors in R.C. 2151.414(E)(7)-(11) apply.

No one factor is dispositive. *In re Ar. L.*, 2024-Ohio-231, at ¶ 29 (1st Dist.).

**{¶42}** Appellants do not dispute the court's conclusion on the first two factors and agree that Mother and the children are bonded, and that the children wish to return to Mother's care.

**{¶43}** However, Mother and F.C.S. suggest that the time the children spent in agency custody weighs in favor of placement with Mother. In *In re P.S.M.*, 2024-Ohio-2794, ¶ 21 (1st Dist.), we held that a child's time in agency custody is measured from the date a child enters agency temporary custody until the date the agency moves for permanent custody. While the magistrate erroneously concluded that the children had remained in agency custody for 1808 days, the juvenile court appropriately determined that children were in custody 706 days, or roughly 23 months, until the agency initially moved for permanent custody. Because the children remained in agency custody for more than 12 months over a 22-month period, R.C. 2151.414(D)(1)(c) has been satisfied.

**{¶44}** Appellants primarily focus on the court's finding under (D)(1)(d) that the children's need for a secure legal placement could not be achieved without a grant of permanent custody, and (D)(1)(e), that the children were abandoned.

**{¶45}** A legally secure placement is "more than a house with four walls" but is a stable environment with one or more dependable adults who will provide for the child's needs." *In re K.D.*, 2024-Ohio-5582, at ¶ 53 (1st Dist.). For a child to be placed out of state, this court has generally recognized that an ICPC approval is required. *In re A.B.*, 2023-Ohio-589, ¶ 26 (1st Dist.), citing *In re E.H.*, 2020-Ohio-28, ¶ 38 (5th Dist.). The ICPC, as adopted in Ohio, applies "to the interstate placement of a child subject to ongoing court jurisdiction in the sending state, due to allegations or findings that the child has been abused, neglected, or [rendered dependent]." R.C.

13

5103.20, Article III(A)(1). The compact provides that "[t]he child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interest of the child." R.C. 5103.23, Article III(D). *See In re A.B.*, at ¶ 25. (holding that without approval from the receiving state, the juvenile court could not approve placement with an out-of-state parent).

**{¶46}** However, there are circumstances where the ICPC is inapplicable. Article III(B) of R.C. 5103.20 recognizes eight exceptions, which includes (B)(5), the placement of a child with a "non-custodial parent." Article II(L) defines a "non-custodial parent" as an individual "at the time of the commencement of court proceedings in the sending state, [who] does not have sole legal custody or has joint legal custody of a child, and who is not the subject of allegations or findings of child abuse or neglect." A noncustodial parent is relieved from having to secure ICPC approval upon (1) the parent proving to the sending state's satisfaction that the parent has a substantial relationship with the child; (2) the court making a written finding that placement with the parent is in the child's best interest; and (3) the court in the sending state dismisses its jurisdiction in the child's case. R.C. 5103.20, Article III(B)(5); *See In re T.K.M.*, 2019-Ohio-5076, ¶ 35 (1st Dist.) (holding that a noncustodial parent was not exempt from needing ICPC approval because he satisfied none of the three conditions).

**{¶47}** Here, Mother does not qualify as a noncustodial parent. At the commencement of this case, Mother had legal custody of the children. Further, the case commenced in response to allegations that Mother had neglected and rendered the children dependent. Our determination that Mother does not qualify as a

noncustodial parent renders further analysis of the R.C. 5103.20, Article III(B)(5) factors as moot.

**{¶48}** Mother's arguments that she is exempt from ICPC applicability is similarly unpersuasive. Mother references R.C. 5103.23, Article III(A), which states that

> No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for *placement in foster care or as a preliminary to a possible adoption* unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.

(Emphasis added.) Mother asserts that since she is not a foster-care placement or adoption possibility, the parameters of the ICPC do not apply.

**{¶49}** This narrow reading of R.C. 5103.23 forgoes other relevant portions of the statute and fails to consider how our case law has addressed the issue. R.C. 5103.23, Article III(D) instructs that no child shall be placed out of state until the receiving state informs the sending state that placement does not conflict with the best interest of the child. This section is written to generally apply, regardless of whether that placement is with a parent. As stated, R.C. 5103.20, Article III(B), which details the exemptions, does provide a narrow exemption for "non-custodial parents," which is not applicable here.

**{¶50}** Further, our case law has consistently recognized that an out-of-state parent, like any out-of-state placement alternative, requires ICPC approval. *See In re A.B.*, 2023-Ohio-589, at ¶ 35 (1st Dist.) (holding that the lack of an approved ICPC makes placement with parent impossible); *In re K.S.*, 2022-Ohio-14, ¶ 36-37 (1st

15

Dist.), quoting *In re T.K.M.*, 2019-Ohio-5076, at ¶ 35 (1st Dist.) (when receiving state does not approve placement, "the child shall not be placed[,]" with that out-of-state parent). Thus, the juvenile court correctly found that Mother cannot serve as a legal secure placement for F.C. and L.S.

{¶51} Even if Mother had an approved ICPC home study, the juvenile court's conclusion that Mother would not serve as a secure placement was supported by competent and credible evidence. The court considered testimony from an HCJFS caseworker that showed that Mother was untruthful about her relationship with F.C.S., and that the two had communicated despite Mother's denials. The court also heard testimony that F.C.S. did not engage in any case services. The court considered the allegations that F.C.S. had beaten Mother in the past and Mother's false claims that F.C.S. had held her hostage and forced her to take drugs. While the GAL testified that the children would be more secure with Mother than in the foster-care system, these concerns do not outweigh the agency's trepidation in placing the children in a home that may expose them to the dangers of domestic violence. Therefore, the juvenile court did not err in concluding that neither Mother nor F.C.S. could serve as a legally secure placement, despite the lack of ICPC approval.

{¶52} As to the parties' challenge with the court's R.C. 2151.414(D)(1)(e) findings, Mother and F.C.S. again challenge the abandonment findings. The (D)(1)(e) section considers if any of the factors in R.C. 2151.414(E)(7) to (11) apply, which include the (E)(10) factor of abandonment. Our prior analysis of Mother's abandonment challenge applies here. Despite her rekindled relationship with F.C. and L.S., Mother has failed to rebut the presumption that she abandoned her children.

{¶53} Accordingly, we conclude that there was clear and convincing evidence to support the juvenile court's decision to grant permanent custody of F.C. and L.S. to

the HCJFS. Without ICPC approval, neither child could be placed with Mother. Further, the best-interest factors are supported by sufficient evidence and weigh in favor of permanent custody being awarded to the agency. Upon a review of the record, the juvenile court did not lose its way.

### III.    Conclusion

**{¶54}** For the forgoing reasons, we overrule each appellant's sole assignment of error.

**{¶55}** The judgment of the juvenile court is affirmed.

Judgment accordingly.

ZAYAS, J., concurs.
KINSLEY, P.J., dissents.

KINSLEY, **Presiding Judge,** dissenting,

**{¶56}** In certain circumstances, Ohio law outsources the determination of whether a child will ever see his parent again to an out-of-state administrative agency. Rather than leaving that life-altering decision to an Ohio court, an Ohio social worker, or anyone with connections to the child in Ohio, the State instead gives the unchecked power to separate a family to another state's executive branch. And it does so without affording even the most basic due process—an attorney, an appeal, the ability to compel necessary evidence—to the parent.

**{¶57}** I cannot condone the application of this broken system to Mother, F.C., and L.S. Because I believe that Ohio law, and Ohio's ICPC statute in specific, violate Mother's due process rights, I would sustain Mother's assignment of error and reverse the judgment of the juvenile court. And because I believe the juvenile court's disposition depriving F.C. and L.S. of their relationship with their Mother was against the manifest weight of the evidence, I would not remand the matter to the juvenile

17

court, but would instead return the children to Mother's sole custody. I therefore respectfully dissent.

### *Due Process*

**{¶58}** The Fourteenth Amendment to the United States Constitution secures the right of all persons to due process before their life, liberty, or property is deprived by state government. *See* U.S. Const., amend. XIV ("nor shall any State deprive any person of life, liberty, or property without due process of law"). Ratified during the Reconstruction Era, this provision was intended to radically limit the power of state courts to conduct unfair proceedings. *Danforth v. Minnesota*, 552 U.S. 264, 269-270 (2008). The core promise of the Due Process Clause is therefore that a hearing to take away a person's liberty will be "fundamentally fair." *Santosky v. Kramer*, 455 U.S. 745, 753-754 (1982).

**{¶59}** The protections of the Due Process Clause apply without regard to a person's citizenship status. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 211 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."). Thus, Ohio citizenship is not a prerequisite to obtaining constitutionally sufficient due process from Ohio courts.

**{¶60}** In the context of parental rights, parents have a well-defined and historically-recognized liberty interest in their relationships with their children. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (identifying a parent's interest in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests"). A parent's liberty interest in raising a child does not evaporate simply because the parent has not behaved perfectly or has temporarily lost custody to the government. *Santosky* at 753. "Even when blood relationships are strained, parents

retain a vital interest in preventing the irretrievable destruction of their family life." *Id.* In fact, the right to parent one's children is so fundamental that termination of parental rights has been described as "the family law equivalent of the death penalty." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). The State must accordingly afford due process to parents before terminating their parental rights. *In re James*, 2007-Ohio-2335, ¶ 16. This means that parents are entitled to "every procedural and substantive protection the law allows." *Hayes* at 48.

**{¶61}** Thus, in a parental termination case, due process consists of, at a bare minimum, a hearing with adequate notice, the opportunity to cross-examine witnesses who make dispositional recommendations, and, in most cases, the right to be present at the hearing itself. *See In re Hoffman,*[2] 2002-Ohio-5368, ¶ 25; *In re N.G.*, 2009-Ohio-4915, ¶ 12 (4th Dist.). A parent facing parental termination is also entitled to appointed counsel under the Ohio Constitution if they cannot afford representation. *See State ex rel. Heller v. Miller*, 61 Ohio St.2d 6 (1980); *see also Lassiter v. Dept. of Social Servs.*, 452 U.S. 18 (1981) (holding that Fourteenth Amendment due process can include the right to appointed counsel in parental termination cases where the matter is particularly complex); R.C. 2151.414(A)(1) (requiring parents in parental termination proceeding to receive notice of right to appointed counsel if they are indigent). And, given the complexity of the procedures by which the government removes children from the care of their parents, additional measures—such as a heightened burden of proof on the State—may also be required to ensure that a

---

[2] In *Hoffman*, the Ohio Supreme Court resolved a question of first impression: does a parent in a parental termination case have a due process right to cross-examine a guardian ad litem on the basis of her custody recommendation? *Hoffman*, 2002-Ohio-5368, at ¶ 10. In answering that question in the affirmative, the Ohio Supreme Court relied squarely upon decisions from South Carolina, the District of Columbia, Minnesota, and California in construing the mandates of constitutional due process. *Id.* at ¶ 19-23.

parent's liberty is constitutionally safeguarded. *See, e.g., Santosky*, 455 U.S. at 769-770 (requiring the government to prove parental termination standards by at least clear and convincing evidence rather than by a preponderance of the evidence).

**{¶62}** When a parent claims entitlement to additional process, the test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), guides the inquiry into whether existing procedures adequately safeguard a parent's liberty interest in raising her children. That test weighs the nature of the parent's interest, the risk of erroneous deprivation of the parent's liberty under existing procedures, and the administrative burden on the government if additional procedures are required. *Id.* In balancing the *Mathews* factors, a parent's interest in a parental termination proceeding is "commanding," "important," and "far more precious than any property right." *Santosky* at 758-759; *Lassiter* at 27.

**{¶63}** Mother argued below and before this court that the application of Ohio's ICPC procedures afforded her constitutionally insufficient due process. I agree. As applied to Mother, Ohio's ICPC statute suffers from four serious constitutional flaws: (1) by vesting the decision to seek an ICPC evaluation entirely with the sending agency, Ohio's ICPC statute does not afford out-of-state parents a meaningful opportunity to be heard; (2) by relying on out-of-state administrative law, Ohio's ICPC statute fails to secure a parent's right to obtain judicial review of an adverse ICPC determination; (3) by failing to ensure that parents facing parental termination have access to counsel to challenge out-of-state ICPC determinations, Ohio's ICPC statute does not comport with the basic tenets of state constitutional due process; and (4) by outsourcing the determination of a child's disposition—an inherently judicial function—to an out-of-state executive agency, Ohio's ICPC statute violates the separation of powers principle. For these reasons, I would sustain Mother's assignment of error and return F.C. and

L.S. to her care.

### A. The Interstate Compact on Placement of Children

**{¶64}** Ohio's ICPC statute is codified in part at R.C. 5103.23. The stated purpose of Ohio's ICPC law is to enable states to cooperate with each other in the interstate placement of children. R.C. 5103.23, Article I. Originally adopted by New York in 1960, ICPC model legislation has been implemented by all 50 states and the District of Columbia. *See In re A.R.M.*, 2020-Ohio-954, ¶ 13 (10th Dist.). ICPC legislation is identical in every state. Ursula Gilmore et al., *Delays in the Interstate Foster and Adoption Home Study Process*, 8 U.C. Davis J.Juv.L. & Policy 55, 61 (2004).

**{¶65}** The ICPC statute places strict guardrails on when Ohio, as the sending agency, may place an abused, neglected, or dependent child with an out-of-state placement. First, the "sending agency" must give written notice to the receiving state of its intention to place the child in that state. R.C. 5103.23, Article I(B). Both child welfare agencies like HCJFS and the juvenile court constitute a "sending agency" under Ohio's ICPC statute. *See id.* at Article II(B) (defining a "sending agency" as "a party state, officer or employee thereof; a subdivision of a party state, or officer of employee thereof; [or] a court of a party state . . . ."). Thus, by the plain terms of the law, both HCJFS and the juvenile court can send notice of an out-of-state placement to a receiving state. Second, the ICPC statute forbids out-of-statement placements until the receiving state notifies the sending agency in writing that the proposed placement "does not appear contrary to the interests of the child." *Id.* at Article III(D). The ICPC statute therefore envisions that the receiving state will conduct an evaluation into whether the out-of-state placement is in the child's interests and will report that information to the sending agency. *See, e.g.,* Gilmore at 61-64 (describing ICPC

evaluation process).

**{¶66}** Many states do not apply the ICPC's notice-and-evaluation requirement to out-of-state placements with a parent, either because the state statute adopting the ICPC specifically excludes parents from the out-of-state evaluation regime or because courts have determined that the overarching purpose of the ICPC does not apply to parents regardless of how a statute is written. *See, e.g., In the Interest of C.R.-A.A.*, 521 S.W.3d 893, 903-907 (Tex.Civ.App. 2017) (summarizing state and federal court holdings on the question of whether the ICPC applies to placements with out-of-state parents). But Ohio courts, including this one, have interpreted the strict mandates of R.C. 5103.23, Article III, to apply to out-of-state placements with parents. *See In re A.B.*, 2023-Ohio-589, ¶ 24-26 (1st Dist.).

**{¶67}** To date, no court in Ohio has considered the due process implications of doing so. But at least one Ohio appellate court has suggested, in dicta, that applying the out-of-state placement requirement to a state which forecloses judicial review of ICPC evaluations would be constitutionally problematic. *See In re B.L.*, 2018-Ohio-547, ¶ 22-23 (12th Dist.) ("Father posits that there is no right to appeal a denied [ICPC] home study in Texas. . . . This court would be concerned if that were true that an Ohio law had effectively incorporated Texas law or policy precluding judicial review of an administrative agency's decision."). And the courts of other states have raised due process concerns with the strict mandates of the ICPC as applied to parents' rights. *See, e.g., L.H. v. Indiana Dept. of Child Servs.*, 142 N.E.3d 977 (Ind.App. 2020) (finding due process violation when state erroneously subjected father to ICPC requirements); *Matter of Emmanuel B. (Lynette J.)*, 175 A.D.3d 49, 60 (N.Y.Sup.Ct. 2019) ("Essentially, the ICPC permits a child to be denied placement . . . at the sole discretion of an administrator, without offering any recourse to the parent. This

bureaucratic barrier between the father and child infringes upon the father's substantive and procedural due process rights as a parent.").[3]

**{¶68}** Mother therefore raises important constitutional questions in this proceeding. In the court below, she sought to compel HCJFS to seek a fourth ICPC evaluation for the purpose of preserving her liberty interest in parenting her children. She additionally challenged the validity of the denial of the third ICPC placement. In this appeal, she expressed confusion as to Kentucky's administrative procedures and requested further action from the juvenile court. Mother is correct that Ohio's ICPC scheme suffers from serious constitutional flaws that undermine the juvenile court's judgment.

### B. Lack of a Meaningful Opportunity to be Heard

**{¶69}** Mother first argues a due process right to compel a fourth ICPC notice-and-evaluation. She contends that the juvenile court should have ordered HCJFS to notify Kentucky of its intent to place F.C. and L.S. with her. And she suggests that, had it done so, the evaluation would have revealed that placement with her was in the children's interests, such that she would have retained custody of her children.

**{¶70}** Parents in a parental termination case have a right to present evidence and witnesses on their behalf. *See In re C.K.*, 2013-Ohio-4513, ¶ 15 (2d Dist.); *see also In re Robert S.*, 966 A.2d 894, ¶ 14 (Me. 2009) (observing that right to present evidence in a parental termination case is a component of due process). As we have explained in other contexts, the right to due process safeguards "the opportunity to be

---

[3] While it can have state constitutional counterparts, due process is, in large part, a federal constitutional principle. Thus, reliance on extraterritorial authorities can be instructive in construing how due process applies in proceedings that sever parental rights. *See, e.g., Hoffman,* 2002-Ohio-5368, at ¶ 19-23 (relying on case law from four jurisdictions outside Ohio in determining that parents have a due process right to cross-examine dispositional witnesses in permanent custody proceedings).

heard at a meaningful time and in a meaningful manner," which includes the opportunity to bring forward evidence that bears on the issues before the court. *Tyra v. Griffith*, 2025-Ohio-912, ¶ 49 (1st Dist.); *State v. Day*, 2022-Ohio-1954, ¶ 15 (1st Dist.).

**{¶71}** The definition of a "sending agency" in R.C. 5103.23, Article II(B), includes child welfare agencies like HCJFS and the juvenile court. But it excludes parents who reside out of state. Thus, a parent is not empowered under the ICPC statute to cause the receiving state to evaluate whether placement with that parent is in the child's interest. And since R.C. 5103.23, Article III(D), as judicially construed, prohibits placing a child with an out-of-state parent absent an approved ICPC, a sending agency can in effect torpedo a parent's liberty interest in parenting their child simply by refusing to notify the receiving state of its intent to send the child there. Stated another way, Ohio's ICPC statute places the decision of whether to seek an out-of-state parental placement solely with the unbridled discretion of the sending agency and outside the reach of the parent.

**{¶72}** Applying the *Mathews* factors, this is constitutionally deficient.[4] The first *Mathews* factor focuses on Mother's interest. *Mathews*, 424 U.S. at 335. As the Supreme Court has repeatedly observed, parents have a commanding liberty interest in their relationship with their children. *See Troxel*, 530 U.S. at 65. Thus, Mother's interest in parenting F.C. and L.S. is both fundamental and strong. *Id.* This weighs in favor of Mother's asserted due process right to compel an ICPC evaluation.

---

[4] Mother raised a constitutional due process right to compel a fourth ICPC evaluation before the juvenile court. That court rejected Mother's argument out of hand without conducting a *Mathews* analysis. The failure to apply the correct constitutional authority to Mother's due process argument is in and of itself a basis for reversing the juvenile court's judgment. The *Mathews* factors are well-settled, and their application to due process claims in parental termination cases has been the law of the land since *Lassiter* was decided by the Supreme Court in 1981. *See Lassiter*, 452 U.S. at 27.

**{¶73}** The second *Mathews* factor considers the risk that Mother's parental rights will be erroneously terminated under the current system. *Mathews* at 335. This risk is high. The ICPC evaluation was an important mechanism by which the juvenile court could assess the children's current interests, and its absence deprived the court of critical information about the children's present reality. As a result, the juvenile court's order cited stale information from 2020 and 2021 rather than more up-to-date details that could have been gained from an ICPC in 2024.

**{¶74}** The final *Mathews* factor accounts for the administrative burden on the State of the additional requested process. *Id*. As to this factor, the juvenile court found that conducting a further ICPC evaluation would take too much time, noting that temporary custody had expired in 2021. But the juvenile court's reliance on a timeline to deny Mother's ICPC request was specious. After all, HCJFS ordered the third ICPC evaluation in late 2023, and the juvenile court never explained why the third evaluation was timely but a fourth would not be. Moreover, federal law requires that all ICPC evaluations be completed and reports be returned to sending agencies within 60 days. *See* 42 U.S.C. 671(a)(26)(A)(i). In contrast, the dispositional hearings in this case lasted more than 90 days, from April 29 to July 31, 2024. Given this difference in timing, an ICPC evaluation would have been the most expeditious way to determine the appropriate placement for F.C. and L.S.

**{¶75}** Under these circumstances, the juvenile court violated Mother's due process rights by interpreting the ICPC to prohibit a fourth evaluation. Mother has a strong liberty interest in retaining a relationship with her children. That interest was negatively impacted by the lack of current information before the juvenile court, since Mother lacked a procedure by which to compel an ICPC evaluation. Engaging with the ICPC process would have caused no more delay in Mother's case than the juvenile

court's own dispositional process did.

**{¶76}** I would accordingly sustain this aspect of Mother's due process challenge and find that Mother has a right to compel the ICPC evaluation that stood between her and her liberty interest in her family.

### C. Lack of Judicial Review in Kentucky

**{¶77}** In addition to challenging her inability to compel a fourth ICPC evaluation, Mother also raised an issue below regarding the invalidity of the third ICPC evaluation. Kentucky rejected placement with Mother in January of 2024 under R.C. 5103.23, Article III(D), because of the ongoing investigation into F.C.S.'s conduct and because of questions about Mother's income. Mother contends that these findings were inaccurate.

**{¶78}** The record supports Mother's contention. Evidence presented to the juvenile court demonstrates that, at least as to the September 2023 incident involving F.C.S., concerns about domestic violence were unfounded. F.C.S. came to Mother's residence to report that he had recently been diagnosed with a congenital health condition that their child may have inherited. While he and Mother may have verbally argued during F.C.S.'s visit, no acts of violence occurred—and certainly none that can be attributed to Mother. The record also demonstrates that Mother had gainful employment at the time of the third ICPC evaluation. Mother therefore makes a compelling argument that HCJFS's third ICPC request should have been granted by Kentucky.

**{¶79}** This raises an additional due process problem with Ohio's ICPC statute: the lack of judicial review when a receiving state denies the placement. In dicta, the Twelfth District expressed its concern over such a state of affairs. *In re B.L.*, 2018-Ohio-547, at ¶ 22-23 (12th Dist.). I share this perspective. Judicial review of denied

out-of-state ICPC evaluations is required to ensure that parents' paramount liberty interests are not erroneously deprived. *Id.*; *see also Mathews*, 424 U.S. at 335.

{¶80} At oral argument, counsel for HCJFS contended that ICPC evaluations are subject to judicial review in Kentucky, citing two regulatory provisions: (1) 922 Ky.Admin.Regs. 1:320, Section 9 ("Section 9"), which permits an aggrieved party from a final order of the secretary of the Cabinet for Health and Family Services to petition for judicial review of that order, and (2) Ky.Rev.Stat.Ann. 23A.010(4), which states in pertinent part that "the Circuit Court may be authorized by law to review the actions or decisions of administrative agencies." Neither of these regulations conclusively secure judicial review for aggrieved parents whose ICPC evaluations are denied by Kentucky authorities.

{¶81} By its very terms, Section 9 applies to final orders issued by the Cabinet secretary after an administrative hearing. This is so because Section 9 refers to final orders issued pursuant to Ky.Rev.Stat.Ann. 13B.120, a statute governing the disposition of administrative hearings. 922 Ky.Admin.Regs. 1:320, Section 3(1)(a)(2) excludes from resolution by administrative hearing any issue a court is currently litigating. An ICPC evaluation of a parent who is a party to a parental termination proceeding therefore cannot be judicially reviewed in Kentucky under Section 9. Because a court is necessarily and simultaneously considering whether to place the child with the parent or to terminate parental rights, the matter cannot be administratively appealed and therefore cannot result in a final order subject to judicial review.

{¶82} Ky.Rev.Stat.Ann. 23A.010(4) provides no meaningful substitute. In addition to the portion of the statute cited in court by HCJFS's attorney, the provision also indicates that circuit court review of administrative agencies is not an appeal but

instead an original action. *See* Ky.Rev.Stat.Ann. 23A.010(4). The form of review afforded by this provision is discretionary, and, as Kentucky courts have held, not every administrative ruling is subject to judicial attack. *Taxpayer's Action Group v. Madison Cty. Bd. of Elections*, 652 S.W.2d 666, 668 (Ky.App. 1983).[5] This provision therefore fails to secure the right of judicial review of a denied ICPC evaluation in Kentucky.

**{¶83}** I do not reach this conclusion lightly or without extensive research. Navigating another state's internal regulations, policies, and procedures governing how ICPC evaluations are to be processed is no small task. Perhaps for this reason, there are no reported (or unreported) Kentucky decisions seeking judicial review of a denied ICPC placement. The ICPC was developed in the 1960s and has been on the books for more than half a century. Yet, to date, no parent in Kentucky has apparently seen fit to challenge an out-of-state placement denial in court.

**{¶84}** Absent an opportunity to seek judicial review of Kentucky's ICPC denial, Mother was denied due process.

### D. *Failure to Safeguard the Right to Counsel*

**{¶85}** Mother was similarly denied the right to an attorney to assist her in navigating Kentucky's complicated judicial review system. The Ohio Constitution requires the appointment of counsel for an indigent parent facing the termination of her parental rights. *See Heller*, 61 Ohio St.2d at 6. Mother qualified for an appointed attorney under this principle. But, as revealed at oral argument, her counsel was unfamiliar with Kentucky law and did not assist her in challenging the third ICPC

---

[5] Kentucky courts have also disclaimed the notion that there is a constitutional right to appeal an administrative decision. *See Franklin v. Natural Resources & Environmental Protection Cabinet*, 1989 Ky.App. LEXIS 46, *4 (Jan. 6, 1989).

denial. This is not to fault Mother's counsel. It is unclear from the record whether she is admitted to practice in Kentucky or whether her appointment to represent Mother in this action included within its scope the obligation to file an original action on Mother's behalf in Kentucky.

{¶86} Certainly Kentucky did not appoint counsel for Mother to assist her in challenging the denied ICPC evaluation. The record contains no indication that any attorney made an appearance in Kentucky on Mother's behalf.

{¶87} Without counsel, Mother lacked the ability to avail herself of any procedures Kentucky law may have established to challenge the ICPC placement denial. The failure to appoint counsel for Mother in Kentucky violated Mother's due process rights under the Ohio Constitution.

### E. Separation of Powers

{¶88} This brings me to my final, and perhaps most serious, concern. R.C. 5103.23, Article III(D), violates the separation of powers principle.

{¶89} Although not explicitly embedded in the Ohio Constitution, the separation of powers principle is inherent and fundamental to our democratic form of government. *State ex rel. Dann v. Taft*, 2006-Ohio-1825, ¶ 55. It embodies a system of checks and balances across the three coequal branches of government—executive, legislative, and judicial. *Id.* The doctrine requires that each branch of government be permitted to exercise its respective powers without encroachment from the others, so that the independence and integrity of each branch of government is preserved. *Id.*; *State ex rel. AFSCME v. Taft*, 2004-Ohio-493, ¶ 31 (3d Dist.).

{¶90} The disposition of parental termination cases is a judicial function. *See* R.C. 2151.414. When the State seeks to permanently remove a child from his parent's custody, the juvenile court is vested with determining the ultimate outcome following

an adversarial hearing. R.C. 2151.414(A)(1), (B)-(E). Neither the General Assembly nor an executive agency has the authority to terminate a parent's custodial rights. *Id.* Only a court has this power. *Id.*

**{¶91}** R.C. 5103.23, Article III(D), disrupts this balance of power by outsourcing the judicial function to an out-of-state executive agency. As judicially construed, Article III(D) precludes placement with an out-of-state parent unless the receiving state's child welfare authority has approved it. *See In re A.B.*, 2023-Ohio-589, at ¶ 24-26 (1st Dist.). This effectively removes the determination of whether a child should be placed with his parent from the judiciary and vests it with another state's executive branch. It in essence gives a veto over a parent's relationship to the other state's evaluator.

**{¶92}** This is how the juvenile court interpreted R.C. 5103.23, Article III(D). On no fewer than four occasions, it held, either directly or indirectly, that it could not place F.C. and L.S. with Mother unless Kentucky approved the placement. It also held that it could not review the receiving state's refusal to accept the placement under the ICPC, in essence making Kentucky's child welfare agency the final arbiter of the children's fate.

**{¶93}** A statute that vests an executive agency with judicial decision-making is unconstitutional. *See State v. Bodyke*, 2010-Ohio-2424, ¶ 53; *State v. Sterling*, 2007-Ohio-1790, ¶ 35. R.C. 5203.23, Article III(D), impermissibly usurps the judiciary's role in determining contested parental termination cases where a parent resides out-of-state. As one New York appellate court observed, "the ICPC permits a child to be denied placement . . . at the sole discretion of an administrator, without offering any recourse to the parent." *Matter of Emmanuel B. (Lynette J.)*, 175 A.D.3d at 60. Particularly given the fundamental liberty interest at stake for the parent, due process

requires more.

**{¶94}** For these reasons, I believe Mother was deprived of her constitutional right to due process. As applied to her, Ohio's ICPC statute failed to afford her a meaningful opportunity to present evidence that would support the return of her children, failed to secure judicial review of Kentucky's ICPC placement denial, failed to protect her right to counsel in Kentucky, and violated the separation of powers principle. I would accordingly sustain Mother's assignment of error and reverse the judgment of the juvenile court terminating Mother's parental rights with respect to F.C. and L.S.

### *Best Interest Factors*

**{¶95}** In addition to Mother's due process arguments, I would also sustain the assignments of error of Mother, Father, and the GAL for the additional reason that the juvenile court abused its discretion in applying the best interest factors. All parties but HCJFS believed it to be in the children's best interests for them to be placed with Mother. This includes the GAL, who had observed the children for five years and was uniquely situated to speak to their best interest. The juvenile court disagreed with the GAL's recommendation on the basis of stale evidence that did not reflect Mother's or the children's current reality. To the extent the juvenile court considered more current information, it drew that information from the faulty third ICPC evaluation that Mother lacked the ability to challenge in Kentucky.

**{¶96}** Contrary to the outdated and unchallenged information cited by the juvenile court, the record reveals that, at the time of the dispositional hearing, Mother had fully completed case plan services, was living a stable and comfortable life, was adequately caring for her other children, and was the best person to provide long-term care and support to F.C. and L.S. The record also reveals instability and uncertainty

in the children's current foster placements, making them an unsuitable alternative to Mother's care. Reviewing the record as a whole, I therefore believe it was in the children's best interest to remain with Mother. I would accordingly conclude that the juvenile court abused its discretion in awarding permanent custody of F.C. and L.S. to HCJFS and would reverse its judgment.